# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CANDIE DORREEN SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00520** |
| | ) | **Judge Aleta A. Trauger** |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Candie Smith brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of the Social Security Administration (Agency), denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and IV, respectively, of the Social Security Act.

On August 3, 2021, the Magistrate Judge issued a Report and Recommendation (R&R) (Doc. No. 24), recommending that the Commissioner's decision be affirmed and that the plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 21) be denied. The plaintiff has filed timely Amended Objections (Doc. No. 26), to which the defendant has responded (Doc. No. 27). For the reasons discussed herein, the court finds that the ALJ's decision is supported by substantial evidence in the record. The court will overrule the Objections, accept the R&R, deny the plaintiff's Motion for Judgment, and affirm the Commissioner's denial of benefits.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for former Commissioner Andrew Saul as the defendant in this lawsuit.

# I.    PROCEDURAL HISTORY

Candie Smith filed several applications for benefits, but, as is also reflected in the medical records summarized below, she has difficulty with follow-through. The court notes that this unfortunate characteristic, while possibly a symptom of her mental disorders, has also obstructed her ability to establish her entitlement to Social Security disability benefits.

Smith filed her first applications for DIB and SSI on October 7, 2016, alleging a disability onset date of April 30, 2015 and an inability to work due to migraines, anxiety, depression, and bipolar disorder. (Doc. No. 19, Administrative Record (AR) 53–65 (Exs. 1A, 2A), 69–90 (Exs. 5A, 6A), 93–96 (Ex. 9A).) The referenced exhibits show that these applications were denied after the plaintiff failed to attend a Consultative Examination and the agency was unable to contact her after multiple attempts. The plaintiff did not appeal.[2]

Smith filed a second set of DIB and SSI applications on January 26, 2017 and January 31, 2017, alleging a revised disability onset date of January 1, 2016, again because of migraines, anxiety, depression, and bipolar disorder. These applications were denied on December 12, 2017, again on the basis of insufficient medical evidence and the plaintiff's failure to keep an appointment for a Consultative Examination. (*See* AR 97–110 (Exs. 10A, 11A), AR 113–16 (Ex. 14A).)[3]

While the second set of applications was still pending, counsel was appointed for the plaintiff around October 3, 2017 (*see* AR 159 (Ex. 1B).) The plaintiff filed her third round of

---

[2] It appears that the plaintiff had moved to Mayfield, Kentucky without notifying the Agency of her change of address. (*See* AR 86.)

[3] Appointed counsel (appointed in October 2017, see below) submitted a Disability Report – Appeal) in January 2018, in which he noted that his law office had "been unable to contact our client recently" but was filing the appeal "blank" in order to preserve the client's right to appeal and to avoid missing the appeal deadline. (AR 292.)

applications for DIB and SSI, through appointed counsel, alleging a disability onset date of March 1, 2013 and an inability to work due to post-traumatic stress disorder (PTSD), bipolar disorder, anxiety, depression, insomnia, and carpal tunnel syndrome. These applications were denied initially (AR 117–25, 126–34 (Exs. 16A, 17A)) and on reconsideration (AR 138–46, 147–155 (Exs. 20A, 21A).) Upon the plaintiff's request, a hearing was conducted on February 6, 2019, before Administrative Law Judge (ALJ) Robert Martin, at which the plaintiff was represented by counsel. The plaintiff and Vocational Expert (VE) David Salewsky testified. (AR 29–56 (Hr'g Tr.).)

At the hearing, the plaintiff testified that she was last engaged in full-time employment in 2014; the last time she had attempted to work was in 2018, at a warehouse chicken plant in Mayfield, Kentucky. She "went off" on her supervisor over being denied an opportunity to use the bathroom during her initial training session and was let go. (AR 34.) She explained that she has difficulty getting along with other people and has been fired from at least five jobs for that reason. (AR 36.) Even when she was working full time, the longest she has kept a job is three months, except for the one occasion when she was able to work from home. (AR 36.)

The plaintiff testified that, in addition to anger outbursts, she suffers from crying spells related to severe depression and had most recently attempted suicide approximately four months prior to the hearing. (AR 37.) She did not go to the hospital that time, because she did not want to be admitted. She also stated that she has memory issues, which she attempts to remedy by carrying around a small notebook in which she writes down things she needs to remember. (AR 37–38.) She attempted on-line school, trying to finish her bachelor's degree, but was unable to keep up and dropped out. (AR 38–39.) She testified that she has difficulty concentrating. (AR 39.)

She testified that she lives with her husband, stepson, and mother, has been with her now-husband for five years and married him in February 2018. (AR 39.) She stated that she is able to do some housework but forgets what she is doing, burns food because she forgets about it, and her mother feeds her fish or they would be dead. (AR 40.) She spends the majority of her time in her room, sleeping and self-isolating. She stated that she has been "back on medications" since June 2018, when she was finally started on medications that do not trigger her mood swings, even though they do not stop them completely either. (AR 41.)

In 2017, when she was admitted to the hospital for a psychiatric incident, she was already on medication, but it triggered her bipolar manic episodes and "messed with [her] memory." (AR 42.) She was off medication from August 2017 until June 2018, purportedly because of side effects. (AR 42.) She claims that, with her medication, she has panic attacks "a couple of times a week," which is less often than it used to be. (AR 46.) She stated that she does not deal well with change.

She has no friends and does not socialize outside her family. (AR 43.) When she is not sleeping, she "spac[es] off" in front of the television without actually watching. (ARE 43.) She goes to Walmart for groceries approximately once a month, with her husband. She does not shop online or engage in social media. (AR 43–44.) She uses an alarm to remind her to take medications. (AR 44.) While her medications help, they make her groggy, dizzy, and nauseated. (AR 47.)

The ALJ thereafter posed several hypotheticals to the VE, who testified that there would be competitive work available for a person able to perform a full range of work at all exertional levels but who was limited to simple, routine, repetitive tasks, simple work-related decisions; who could occasionally interact with supervisors and coworkers but could not interact with the general public; and who could adapt to occasional changes in the work place and maintain concentration, persistence, and pace for such tasks with normal breaks spread throughout the work day. (AR 49–

50.) However, if the person in question could not interact appropriately with supervisors, coworkers, or the general public, there would be no competitive employment available for that person. (AR 50.) Likewise, if she needed four additional unscheduled work breaks during an eight-hour work day and would be absent more than two days a month due to her medical condition, that person would not be employable. (AR 50.)

The ALJ issued a written opinion denying the plaintiff's claims on May 8, 2019. (AR 12–22.) The ALJ found that (1) the plaintiff has not engaged in substantial gainful activity since the alleged onset date of March 1, 2013; (2) the plaintiff has severe impairments of bipolar disorder, PTSD, and alcohol use disorder (in remission); (3) the plaintiff does not have an impairment or a combination of impairments that meets or medically equals in severity one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (specifically referencing Listings 12.04, 12.06, 12.08, and 12.15); (4) the plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with nonexertional limitations, including that: she is limited to simple, routine, and repetitive tasks and simple work-related decisions; she can interact occasionally with supervisors and co-workers but cannot interact with the general public; she can adapt to occasional changes in the workplace; and she can maintain concentration, persistence, and pace for such tasks with normal breaks spread throughout the day; (5) the plaintiff was unable to perform past relevant work; (6) in light of her age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that the plaintiff can perform; and (7) the plaintiff, therefore, is not disabled. (AR 15–21.)

In reaching that decision, the ALJ found it significant that the plaintiff was discharged from therapy in November 2017 after failing to show up for three appointments in September and October 2017; she had been off medication from August 2017 through June 2018, purportedly

because of side effects but without trying to find other medications to help her; and she was discharged from case management services in August 2018[4] after a case manager attempted on multiple occasions to perform a home visit. (AR 19.) Based on that evidence as well as repeated statements in her mental health treatment notes that she had "normal memory, mood, affect, insight and judgment" (AR 18) and the fact that she was able to live with her husband, stepson, and mother, the ALJ concluded that, while the plaintiff had "some significant mental limitations because of her impairments," she was "not as limited as she alleged." (AR 18.)

The Appeals Counsel denied Smith's request for a review of the ALJ's decision on April 20, 2020 (AR 1–3), making the ALJ's decision the final decision of the Commissioner.

The plaintiff filed her Complaint initiating this action on June 22, 2020. (Doc. No. 1.) The Commissioner filed an Answer denying liability (Doc. No. 18) and a complete copy of the Administrative Record (Doc. No. 19). The plaintiff thereafter filed her Motion for Judgment on the Administrative Record and supporting Memorandum of Law. (Doc. Nos. 21, 21-1.) The Commissioner filed a Response (Doc. No. 22), and the plaintiff filed a Reply (Doc. No. 23). On August 3, 2021, the magistrate judge issued her R&R (Doc. No. 24), recommending that the plaintiff's motion be denied and that the Commissioner's decision be affirmed. As indicated above, the plaintiff's Amended Objections (Doc. No. 26) (superseding her original Objections (Doc. No. 25)) are now before the court, to which the Commissioner has filed a Response (Doc. No. 27).

---

[4] The ALJ's opinion actually states that this occurred in August 2019. The opinion, however, was issued in May 2019, and the record makes it clear that the case manager's attempts to make contact with the plaintiff occurred in July and August 2018 and that the plaintiff was discharged from case management services as a result on August 30, 2018. (AR 515–21.)

## II.    ADMINSTRATIVE RECORD

The record reflects that the plaintiff's first two sets of applications for DIB and SSI were denied based on insufficient evidence in the record and the fact that there were no medical opinions from an "acceptable medical source." (AR 57, 69.) Both of the initial determinations concluded that a consultative examination was needed, but the plaintiff failed to appear for her scheduled examinations.

The medical evidence in the record reflects that the plaintiff was transported by law enforcement to the Emergency Room of Sycamore Shoals Hospital in Elizabethton, Tennessee on August 6, 2015 based on a suicide threat. (*See* AR 338.) She reported worsening depression over the preceding six months (AR 340) and was diagnosed with depression with suicidal ideation (AR 341). Following this event, Smith received medical management and therapy at the East Tennessee State University College of Nursing from August 25, 2015 through February 23, 2016. (AR 358–454.) The treatment notes from this time indicate that she reported that functioning was "extremely difficult" in August, due to symptoms including anxiety, characterized by sweating and trembling, fearfulness, depression, difficulty concentrating, diminished interest, excessive worry, fatigue and restlessness, difficulty falling asleep or staying asleep, paranoia, restlessness, and agitation. (*See* AR 387.) By January, however, the diagnosis was "mild depression," and medication was noted to relieve her symptoms. (AR 358.) She experienced a traumatic event shortly after that—someone "pulled a gun" on her (AR 414)—which triggered an increase in her symptoms and a decrease in the effectiveness of her medications (*see* AR 396). On February 23, 2016, her therapist observed that the plaintiff was anxious and irritable, with "constricted" affect and inappropriate laughter, psychomotor agitation of her legs and hands, constant shifting in her chair, and pressured speech. She had made a recent attempt to go back to work but was fired "due to poor anger control." (AR 396–97.) The therapist noted that her support group was "poor," as it was limited only to her

mother, and assessed her as having a GAF (global assessment of functioning) score of 52 (increased from 45 in December 2015). (AR 364, 398.) The same assessment noted that the client was "unemployed/unable to work due to severe psychiatric disorders," including major depressive disorder ("recurrent severe w/o psychotic features), chronic PTSD, bipolar disorder, and borderline personality disorder. (AR 398.)

After this visit, however, there is a lengthy gap in the plaintiff's treatment records and no evidence regarding her condition or functioning from February 2016 until October 2016, when she saw Dr. Jeff Carrico at Western Kentucky Family Healthcare in Mayfield, Kentucky, to whom she expressed a desire to "restart bipolar medications." (AR 457.) She was restarted on medications (lamotrigine and paroxetine) and saw Dr. Carrico four times, once a month, until January 25, 2017. (AR 457–61.) After that, she disappeared again for another six months.

She resurfaced on July 11, 2017 at Centerstone Community Mental Health in Clarksville, Tennessee, where she applied for "Safetynet" assistance, as she had no insurance, and reported bipolar disorder and depression. (AR 464.) She reported having attempted suicide and claimed to be experiencing extreme mood shifts, anger, isolation, and to have no support beyond the fiancé whom she had been with for one and one-half years. (AR 464–65.) The intake assessment indicates that the plaintiff's motivation for treatment was "unclear," but her possible strengths included that she was seeking treatment and had strong support from her boyfriend, but "little support system" aside from him. (AR 467–69.)

She was involuntarily admitted from Centerstone to Northcrest Medical Center in Springfield, Tennessee on the same date as being at risk of suicide, pending admission to the Middle Tennessee Mental Health Institute (MTMHI). (AR 551.) She was medicated and remained at Northcrest for several days, as there was no space at MTMHI. (AR 552–616.) By the time she

was finally admitted to MTMHI on July 14, 2017, she was immediately released as having already been stabilized. (AR 555, 613, 509.)

She saw a therapist at Centerstone on July 25, 2017, presenting as a "hospital discharge." (AR 491.) She was considered no longer a suicide risk, as she and her fiancé both confirmed that she was more balanced and that her mood was improved. (AR 481.) The therapist recommended a treatment plan including case management services, therapy up to four times per month, and medical management up to four times per month. (AR 498.) Three weeks later, on August 10, 2017, the plaintiff noted significant improvement and presented in a calm mood, with calm affect and congenial attitude. (AR 484.) The therapist noted that, after the ER visit, the plaintiff had been taken off a medication that triggered manic episodes in her (Topomax) and continued on Cymbalta. (AR 484.) On August 22, however, the plaintiff left a voicemail reporting that she was out of medications and experiencing withdrawal and that she needed to get in for psychiatric evaluation before her next scheduled date. She was told that there were no appointments available but that she should go to the ER or a mental health center if necessary. (AR 481.) She failed to show up for her appointment on September 5, 2017 but presented for her appointment on September 19, 2017, stating that she "want[ed] to get on the right medications." (AR 476.) She failed to present for her next three appointments and was discharged from treatment. (AR 472.)

After another lengthy gap in her records, this time of eight months, she was referred for case management and mental health counseling at the Tennessee Mental Health Cooperative to treat bipolar disorder and depression. (AR 501–02 (summary of treatment).) At her therapy appointment on June 5, 2018, she reported that she was "coming into services to get back on medications." She claimed that she had previously been on Topomax and Cymbalta, but these caused her to "have uncontrollable mood swings that led her into a downward spiral." (AR 508.)

She stated that she had been off medications since August 2017. The mental status exam conducted on June 5, 2018 indicated that she was anxious, depressed, and irritated, with an "exaggerated" affect, but had linear, logical, and goal-directed thought processes, "fair" insight and judgment, good hygiene, and good eye contact, with no overt cognitive defect and intact memory. (AR 510.) She was started that day on aripiprazole, brand name Abilify. (AR 511.) She called a week later to say that the Abilify made her feel groggy all day and was advised to take a half tablet at bedtime and to call back if the symptoms continued. (AR 512.)

After that, her case manager was able to get in touch with her on the telephone on June 21 and July 27, 2018 but was never able to meet with her at her home. (AR 514–20.) As noted by the ALJ, case management services were terminated effective August 30, 2018 based on the case manager's inability to make contact by phone or at the plaintiff's home. (AR 521.) There was no indication of additional medical management or therapy from that date through her ALJ hearing date in February 2019.

## III.    STANDARD OF REVIEW

In Social Security cases under Title II or Title XIV, the court's review of an ALJ's decision is limited to a determination of whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see* 42 U.S.C. § 405 (g) (2012) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

Substantial evidence has long been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *see also McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 521 (6th Cir. 2008) (stating that substantial evidence is "more than a

scintilla of evidence but less than a preponderance") (internal quotation marks and citation omitted); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (same).

"The substantial evidence standard . . . presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts." *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "Therefore, if substantial evidence supports an ALJ's decision, the court defers to that finding, 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Id.* (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## IV. DISCUSSION

The plaintiff's Motion for Judgment presents two assertions of error: (1) that the ALJ's determination of her residual functional capacity is not supported by substantial evidence in the record, because the ALJ failed to procure a medical opinion pertaining to the plaintiff's mental functioning; and (2) the ALJ failed to properly evaluate the plaintiff's subjective complaints. (Doc. No. 21-1, at 10.) On the basis of these arguments, she requests that the Commissioner's decision be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g)[5] for additional consideration. (*Id.* at 19.) The magistrate judge recommends denying the plaintiff's motion, finding neither argument persuasive. (Doc. No. 24.)

In her Objections, the plaintiff again argues that: (1) the ALJ's RFC determination is not supported by substantial evidence in the record, because he "failed to discharge his duty and develop the record, given there were no medical opinions that contained a functional analysis" (Doc. No. 26, at 1); and (2) the RFC determination was "unsupported by substantial evidence as

---

[5] Sentence four of § 405(g) states that "[t]he court shall have the power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with our without remanding the cause for a rehearing."

[the ALJ] failed to properly consider Plaintiff's subjective complaints, instead relying wholly on his sparse summary of the objective evidence and his resulting conclusory statements" (*id.* at 4).

### A.      The Absence of Medical Opinion Containing a Functional Analysis

In support of her objection to the Magistrate Judge's treatment of her argument in her Motion for Judgment that the ALJ failed to adequately develop the record, the plaintiff contends, in particular, that the Magistrate Judge erred in rejecting the holding in *Deskin v. Commissioner of Social Security*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), as overly broad; she insists that subsequent caselaw confirms that *Deskin* is absolutely on point and applies in this case. Having reviewed this issue *de novo*, the court finds no error in the Magistrate Judge's handling of this issue.

In particular, the plaintiff cites and relies on *Deskin* and other district court opinions, largely also from Ohio, in support of the proposition that, "[a]s a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Deskin*, 605 F. Supp. 2d at 912. The Sixth Circuit, however, has repeatedly declined to adopt such a rule. *See, e.g.*, *Reinartz v. Comm'r of Soc. Sec.*, 795 F. App'x 448, 449 (6th Cir. 2020) (rejecting the plaintiff's argument that "an ALJ may not make a work-capacity finding without a medical opinion that reaches the same conclusion," because "[t]he effect of a claimant's conditions on her ability to work . . . is a determination expressly reserved for the ALJ" and, therefore, that "the premise of [the plaintiff's] argument—that the ALJ lacked the capacity to make this determination—is wrong"); *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding . . . ."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional

capacity rests with the ALJ, not a physician." (citing 20 C.F.R. §§ 404.1546(c), 416.946(c))). Rather, the law is simply that "the administrative law judge must make a connection between the evidence relied on and the conclusion reached." *Tucker*, 775 F. App'x at 226. Thus, as the Magistrate Judge found, the plaintiff's contention that the ALJ erred by failing to base his RFC on a medical opinion fails as a matter of law.

Relatedly, the plaintiff contends that the ALJ failed in his duty to develop the record, as a result of which the requisite connection between the evidence and the RFC determination is missing. The Magistrate Judge addressed this issue, noting, in particular, that this argument "rings hollow given Plaintiff's failure to attend multiple scheduled consultative examinations." (Doc. No. 24, at 8 (referencing missed consultations in June 2016 and April 2017 and the agency's repeated efforts to contact the plaintiff to reschedule).) The plaintiff argues that the ALJ failed to properly address the evidence in the record that did *not* support his conclusion and that the Magistrate Judge erred in concluding that the ALJ discharged his duty to develop the record, simply on the basis that the plaintiff failed to attend several scheduled consultative examinations. (Doc. No. 26, at 3.) She contends that "there is no evidence in the record to show Plaintiff was aware of these scheduled evaluations," as a result of which, the Magistrate Judge erred in finding that the ALJ discharged his duty by simply referring to these missed consultations without performing any analysis of why the plaintiff did not pursue treatment, as required by SSR 16-3P. (*See* Doc. No. 26, at 4 ("The Magistrate Judge is not permitted to simply rely upon Plaintiff's failure to pursue treatment without considering the reasons why she may not have obtained it.").) The plaintiff insists that, contrary to the Magistrate Judge's finding that she was attempting to "subvert the well established principle that a claimant bears the burden of producing evidence that demonstrates her entitlement to benefits" (Doc. No. 24, at 9), she is simply asserting that *her* failure to attend consultative

examinations did not absolve the *ALJ* of his duty to develop the record (Doc. No. 26, at 3). And further, that, under SSR 16-3p, an ALJ confronted with a claimant who has failed to pursue treatment must consider the reasons *why* she did not pursue treatment, including, for example, whether, "[d]ue to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

The court finds, however, that the plaintiff's repeated failure to follow up on treatment and her habit of moving without alerting the Social Security Administration of her new address or telephone number is well documented in the record, and it is the plaintiff who, despite being given the opportunity, failed to present evidence addressing the question of why she repeatedly dropped out of treatment, repeatedly failed to show up for scheduled appointments, and failed to respond to efforts by the Agency to schedule consultative examinations. Further, as the Magistrate Judge found, although the absence of opinion evidence is troubling, the "burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (internal citation omitted). And in this case, the ALJ's purported failure to "discharge his duty and develop the record" (Docket No. 21-1 at 10) is actually the product of the plaintiff's failure to attend multiple consultative examinations that were scheduled to develop the record by obtaining opinion evidence that would shed light on the functional limitations caused by her mental condition. That failure is compounded by the generally sporadic nature of the plaintiff's treatment. These factors support a finding that Plaintiff is not disabled. *Accord Jones o/b/o C.C.J. v. Colvin*, No. 2:16-CV-02024-TMP, 2018 WL 2158776, at *5 (W.D. Tenn. May 10, 2018) (collecting cases holding that a claimant's failure to cooperate in a

consultative examination without explanation may be sufficient to deny a disability claim); *see also Moon v. Sullivan*, 923 F.2d 1175, 1192 (6th Cir. 1990) (finding that the sporadic nature of the plaintiff's mental health treatment supported the ALJ's conclusion that the claimant was not disabled).

### B. The ALJ's Treatment of the Plaintiffs' Subjective Complaints

The plaintiff objects that the ALJ failed to properly consider the plaintiff's subjective complaints, instead relying wholly on his "sparse summary of the objective evidence and his resulting conclusory statements." (Doc. No. 26, at 4.) The Magistrate Judge fully considered and rejected this argument, with reference to SSR 16-3p (Doc. No. 24, at 13–15), and the plaintiff has not pointed to any particular error in the Magistrate Judge's assessment, which the court incorporates in full here. In particular, while rejecting some parts of the ALJ's reasoning, the Magistrate Judge noted that

> the ALJ appropriately highlighted Plaintiff's propensity for skipping scheduled therapy sessions, which ultimately led to the termination of case management services. (AR 472–75, 480, 486, 521, 527, 532–36, 540.) Plaintiff's failure to comply with such recommended treatment "suggest[s] that [her] conditions were not as severe as [she] made them out to be." *Blaim v. Comm'r of Soc. Sec.*, 595 F. App'x 496, 499 (6th Cir. 2014). *See also Peters v. Colvin*, No. 2:15-CV-217, 2016 WL 4965114, at *9 (E.D. Tenn. Aug. 26, 2016), *report and recommendation adopted*, 2016 WL 4921031 (E.D. Tenn. Sept. 14, 2016) ("Noncompliance with treatment is a legitimate credibility factor for an ALJ to consider."). The ALJ also noted Plaintiff's "fair ability to complete her activities of daily living," and the consistently "normal" findings documented with respect to her memory (AR 16, 18, 341, 361, 368, 376, 384, 389, 510), which stand in contrast to Plaintiff's testimony suggesting that poor memory prevents her from doing basic chores. (AR 40.) Such evidence provides substantial evidence in support of the ALJ's determination.

(Doc. No. 24, at 15.)

The court finds no error in the Magistrate Judge's assessment of the ALJ's decision, in particular the conclusion that the ALJ's decision is supported by substantial evidence and that the

plaintiff's pointing to evidence that supports a finding of disability does not serve to demonstrate otherwise. (*See id.* at 16.)

## V.     CONCLUSION

For the reasons set forth herein, the court will overrule the plaintiff's Objections, accept the R&R, and, consequently, deny the Motion for Judgment, and affirm the agency determination. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge